# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNSYLVANIA OIL AND GAS ASSOCIATION, *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 1:08-cv-0162 Erie |
| UNITED STATES FOREST SERVICE, *et al.*, | ) Judge Mark R. Hornak |
| Defendants. | )<br>)<br>)<br>) |

## OPINION

**Mark R. Hornak, United States District Judge**

This case represents the latest skirmish in a sprawling series of litigation between the United States Forest Service ("Forest Service") and private owners of mineral and gas reserves located within the Allegheny National Forest ("ANF"). In the instant action, the Pennsylvania Independent Oil and Gas Association ("PIOGA") and the Allegheny Forest Alliance ("AFA") contend that the 2007 Revised Land and Resource Management Plan ("2007 Plan") for the ANF must be vacated because it violates the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), the National Forest Management Act, 16 U.S.C. § 1600 *et seq.* ("NFMA"), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). For the reasons set forth below, the action will be dismissed without prejudice for want of live justiciable case or controversy.

## I. BACKGROUND

Plaintiffs instituted this action by way of a complaint filed on May 27, 2008, naming the Forest Service, the Deputy Chief of the United States Forest Service, and the Regional Forester of the Eastern Region of the United States Forest Service as defendants.[1] ECF No. 1. At that time, the Forest Service, supported by environmental groups such as the Sierra Club and the Forest Service Employees for Environmental Ethics ("FSEEE"), was attempting to significantly alter the procedures through which owners of private mineral and gas interests in the ANF access and extract those resources. This is one of several actions filed by private oil and gas companies challenging those changes.[2]

By way of background, over 93% of the mineral estates in the ANF are privately owned. See Minard Run Oil Co. v. U.S. Forest Service, 670 F.3d 236, 243 (3rd Cir. 2011) ("Minard Run III"). Prior to 2008, access to private oil and gas holdings within the ANF traditionally occurred as the result of a cooperative process known as the "Minard Run framework," derived from the district court's decision in United States v. Minard Run, 1980 U.S. Dist. Lexis 9570 (W.D. Pa. 1980). Pursuant to this framework, oil and gas drillers were required to supply the Forest Service with detailed notice concerning proposed drilling activities at least 60 days before commencing drilling operations. Minard Run III, 670 F.3d at 244 (describing the mechanics of the so-called "Minard Run framework"). This notice period provided the Forest Service with an opportunity to review the drilling proposal and request any modifications or revisions that it

---

[1] At the time that this action was instituted, Joel Holtrop served as Deputy Chief and Kent Connaughton served as Regional Forester for the Eastern Region. Those positions are currently held by Leslie Weldon and Chuck Myers, respectively.
[2] The other cases include Duhring Resources Co. v. The Forest Service, No. 1:07-cv-314 (W.D. Pa. 2007); PAPCO, Inc. v. U.S. Forest Service, 814 F.Supp.2d 477 (W.D. Pa. Aug. 30, 2011); Catalyst Energy, Inc. v. U.S. Forest Service, No. 1:09-cv-70 (W.D. Pa. 2009); Minard Run Oil Co. v. U.S. Forest Service, 2009 WL 4937785 (W.D. Pa. Dec. 15, 2009); and Seneca Resources Corp. v. U.S. Forest Service, No. 1:09-cv-154 (W.D. Pa. 2009).

deemed necessary in order to protect the integrity of the surface estate. The parties would then enter into cooperative negotiations to address and mitigate any potentially unnecessary or harmful surface use. Id. Once an agreement was reached, the Forest Service would issue a document styled a "Notice to Proceed" ("NTP") to confirm that the driller had given proper notice and memorialize any agreements between the parties concerning the proposed drilling operation. Id. This cooperative framework "governed relations between drillers and the Forest Service from 1980 until approximately 2009." Id. at 245.

On November 20, 2008, several environmental groups filed an action against the Forest Service seeking a declaration that the practice of issuing NTPs without first conducting an appropriate environmental review was contrary to NEPA. See FSEEE v. U.S. Forest Service, 2009 WL 1324154 (W.D. Pa. May 12, 2009). In early 2009, the Forest Service settled the action by agreeing to "undertake appropriate NEPA analysis prior to issuing Notices to Proceed, or any other instrument authorizing access to and surface occupancy of the Forest for oil and gas projects on split estates . . ." Minard Run III, 670 F.3d at 245. In support of this change in policy, the Forest Service took the new position that the issuance of an NTP was a "major federal action" subject to NEPA because "mineral rights owners were *required* to obtain an NTP prior to making any changes to land in the ANF." Id. at 245-46 (emphasis added).

Private mineral owners promptly challenged the settlement agreement in federal court, contending that an NTP is an informal document, rather than a mandatory precondition to the exercise of oil and gas rights, and maintaining that the Forest Service lacked sufficient regulatory authority over the dominant mineral estate to restrict or bar drilling activities for the length of time required to complete the proposed environmental analysis. See Minard Run Oil Co. v. U.S. Forest Service, 2009 WL 4937785 (W.D. Pa. Dec. 15, 2009) ("Minard Run II"). On December

15, 2009, Judge Sean J. McLaughlin granted the plaintiffs' request for a preliminary injunction and enjoined the Forest Service from "requiring the preparation of a NEPA document as a precondition to the exercise of private oil and gas rights in the ANF." Id. Following an appeal, the Third Circuit affirmed Judge McLaughlin's injunction order in its entirety, agreeing that the Forest Service "[did] not have the broad authority it claim[ed] over private mineral rights owners' access to surface lands." Minard Run III, 670 F.3d at 254. The preliminary injunction was subsequently converted into a final declaratory judgment on the merits and, following another appeal, the Third Circuit again affirmed. See Minard Run Oil Co. v. U.S. Forest Service, 894 F.Supp.2d 642, 654 (W.D. Pa. 2012) ("Minard Run IV"), *aff'd*, 2013 WL 5357066 (3rd Cir. 2013) ("Minard Run V").

While Minard Run II was winding its way through the federal courts, the Forest Service was concurrently engaged in the process of revising the 1986 Allegheny National Forest Plan ("1986 Plan").[3] Throughout the time that the 1986 Plan was in effect, the Forest Service had uniformly adhered to the cooperative management approach embodied in the original Minard Run framework. A preliminary draft of the revised forest plan issued by the Forest Service in 2006 was consistent with this long-standing approach. AR 11266, 12080. However, when the Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") for the 2007 Plan was approved by the Regional Forester on February 2, 2007, it contained several new measures and design criteria intended to restrict and regulate private oil and gas development in the ANF. AR 12816. As a result of these changes, Plaintiffs administratively appealed the 2007

---

[3] The National Forest Management Act ("NFMA") requires the Secretary of Agriculture to develop "land and resource management plans" to guide the use and preservation of resources within the national forest system. 16 U.S.C. §§ 1601-1604. These forest plans must be revised and updated "at least every fifteen years." 16 U.S.C. § 1604(f)(5)(A). The final result is a "large document, complete with glossary and appendices, dividing a forest into 'management areas' and stipulating how resources in each of these areas will be administered." Sierra Club v. Marita, 46 F.3d 606, 611 (7th Cir. 1995).

4

Plan, arguing that the new criteria had been inserted without any opportunity for public comment and that the Forest Service lacked the regulatory authority to implement the proposed restrictions on the extraction of privately owned minerals. AR 8125-8136. By way of relief, Plaintiffs requested, *inter alia*, that the challenged design criteria be stricken from the 2007 Plan and that "the 1986 Plan be reinstated as the Forest Service plan with respect to oil and gas development in the ANF." AR 8132-8133.

On February 15, 2008, the Chief of the Forest Service issued an appellate decision in which he affirmed and finalized the 2007 Plan, but agreed with Plaintiffs that the FEIS and ROD contained procedural violations with respect to the new oil and gas criteria. AR at 4803-4806. The Chief issued three mandatory instructions designed to address those deficiencies:

Instruction 1:

I find the public was not provided the opportunity to comment on substantial changes made to the design criteria as it applies to private oil and gas development (OGD). The application of all forest-wide standards to private OGD was a change from the preliminary Land and Resources Management Plan (LRMP). Further, the design criteria specific to private OGD in Section 2800 was changed. These changes occurred between the Draft Environmental Impact Statement (DEIS) and the FEIS. This does not fully comply with 40 CFR 1502.9(c)(1). I instruct you to provide the public the opportunity to comment on these changes in accordance with FSH 1909.15, Chapter 18.2. Until that time, applying the use of the Revised Plan design criteria to private OGD is suspended. During that time, in order to carry out our surface management responsibilities, I expect you to follow the site-specific authority as provided in the 1986 ANF Plan to administer private OGD.

\* \* \* \* \* \* \* \*

Instruction 2:

Based upon my review of the appeal record, I instruct you to incorporate language in the ROD, Revised Plan and FEIS to clarify the Allegheny NF's authority to manage oil and gas activities. This includes:

5

> Identifying the roles and responsibilities of the Forest Service, State of Pennsylvania and the private oil and gas operator for the purpose of protection of surface resources from oil and gas development.
>
> Distinguishing between reserved and outstanding rights and how the management of these two distinct private mineral estates may vary depending upon language in individual deeds and/or the USDA Secretary's rules and regulations.
>
> Reviewing and clarifying, where appropriate, the process identified in FEIS Appendix F (p, F-5).

\* \* \* \* \* \* \* \*

Instruction 3:

> I find that the disclosure of cumulative effects of OGD on Allegheny NF air quality as well as impacts to regional air quality does not fully comply with NEPA regulations at 40 C.F.R. parts 1502.16 and 1508.7. Therefore, I instruct you to more fully document the cumulative effects of OGD on air quality. I further instruct you to follow the agency policy for consideration of new information to determine any subsequent actions that may be necessary.

\* \* \* \* \* \* \* \*

AR at 4803-4806. By way of immediate remedy, the Chief ordered the suspension of the new oil and gas measures and directed the ANF Forest Supervisor to return to managing oil and gas development in the ANF pursuant to the 1986 Plan. AR 4803.

On January 16, 2009, the Regional Forester instructed the ANF Forest Supervisor to prepare a Supplemental Environmental Impact Statement ("SEIS") addressing the deficiencies identified by the Chief. After soliciting input from the public through submitted comments and open meetings, the Forest Service issued a draft SEIS for public comment on July 31, 2009. 74 Fed. Reg. 38187. However, before any further action could be taken, Judge McLaughlin issued his decision in Minard Run II ordering the Forest Service to return to processing drilling

6

proposals "in the same form and manner in which they had been prior to the inception of the drilling ban and consistent with the procedures set forth in [Minard Run I]." Minard Run II, 2009 WL 4937785, *34. In light of that ruling (and the Third Circuit's subsequent affirmance), the Forest Service has taken no further steps towards altering the oil and gas procedures currently in effect. See Hearing Transcript, ECF No. 56, pp. 4, 9. Indeed, without making any binding representations, defense counsel suggested at a recent status conference that the Forest Service has now abandoned any intent to modify those long-standing oil and gas protocols. Id.

## II. **PROCEDURAL HISTORY**

Plaintiffs initially moved for summary judgment on August 23, 2009. ECF No. 18. Defendants responded by filing a motion to dismiss on October 21, 2009. ECF No. 25. On May 5, 2010, the parties orally moved to stay this action in light of the preliminary injunction granted by Judge McLaughlin in Minard Run II and the pending appeal. ECF No. 47. All pending motions were terminated and this action was administratively closed. Id.

Shortly after the Third Circuit issued its decision to affirm the preliminary injunction order in all respects, the parties filed supplemental briefs in support of their prior dispositive motions. ECF Nos. 49, 51. On August 28, 2013, this action was transferred to the docket of the undersigned following Judge McLaughlin's resignation. This matter is now ripe for disposition.

## III. **ANALYSIS**

As noted above, the Forest Service, in recognition of the Chief's appellate decision, does not dispute that the decision-making process that produced the new oil and gas provisions in the 2007 Plan violated NEPA. The fundamental disagreement between the parties concerns the

7

appropriate remedy for those violations. Plaintiffs suggest that the only appropriate relief is to strike down the 2007 Plan in its entirety. Defendants respond that the proper remedy is to simply strike the offending provisions and permit the Forest Service an opportunity to correct the deficiencies. They maintain that, by suspending the new design criteria and reinstating the oil and gas provisions set forth in the 1986 Plan, the Forest Service Chief has already provided the Plaintiffs with the precise remedy they are seeking: the ability to participate in the revision process and a return to the status quo of the Minard Run framework.

In light of the corrective action already undertaken by the Forest Service, the Court believes that this action presents a threshold question as to whether an ongoing "case or controversy" exists. See, e.g., Keitel v. Mazurkiewicz, 729 F.3d 278, 279-80 (3rd Cir. 2013) ("Article III of the Constitution limits the federal courts to adjudication of actual, ongoing '[c]ases' and '[c]ontroversies.'"). It is the Court's view that either of two overlapping doctrines - ripeness and mootness – potentially vitiates the existence of justiciability in this case. See Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 137 (3rd Cir. 2009) ("Courts enforce the case-or-controversy requirement through several justiciability doctrines" including "ripeness [and] mootness"). The doctrine of ripeness concerns itself with whether an action has "matured to the point that warrants decision," while the mootness doctrine asks whether "the interests originally sufficient to confer standing persist throughout the suit." 13A C.Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §§ 3532, 3533.1 (3d ed. 2013). In many instances, "[t]he concepts may become mingled completely" because each is focused on "whether there is yet any injury so significant as to require a remedy." Id.; see also Wigton v. Berry, 2013 WL 2471762, at *18 (W.D. Pa. Jun. 7, 2013) ("[I]t is difficult to pin down the exact category of the potential justiciability concern: whether the case is not yet ripe, because Plaintiffs are too early in

challenging a failure to receive a remedy which they are about to receive anyway; [or] whether the case is moot, because at least since the filing of this action, intervening events have removed a controversy between the parties."). In order to determine whether either or both doctrines bar judicial relief, a review of the remedies typically associated with procedural NEPA violations is warranted.

It is well-established that the purpose of NEPA is to "make decision makers aware of the potential environmental ramifications of their actions." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). Thus, rather than mandate any particular results, the statute targets the decision-making process itself, requiring agencies to inform themselves by taking a "hard look" at the environmental impact of a proposed action. Id. at 350; Morris County Trust for Historic Preservation v. Pierce, 714 F.2d 271, 274-75 (3rd Cir. 1983). The typical remedy for an agency's failure to meet NEPA's requirements is to "enjoin the project and maintain the status quo until the agency has complied with NEPA's procedures." Citizens Advisory Committee on Private Prisons, Inc. v. U.S. Department of Justice, 197 F.Supp.2d 226, 249-50 (W.D. Pa. 2001) (citing Richland Park Homeowners Assoc., Inc. v. Pierce, 671 F.2d 935, 941 (5th Cir. 1982)). However, federal courts "almost uniformly" give agencies an opportunity to undertake the requisite corrective measures on their own. Citizens Advisory Committee, 197 F.Supp.2d at 249; Natural Resources Defense Council, Inc. v. U.S. Army Corps of Engineers, 457 F.Supp.2d 198, 222 (S.D. N.Y. 2006) (noting that an agency may cure a NEPA violation by "postpone[ing] its project and objectively and in good faith reassess[ing] the potential environmental impacts").

In Citizens Advisory Committee, for example, the Federal Bureau of Prisons awarded a contract to build a proposed federal prison without adequately considering the environmental consequences of the project. Id. at 231. Recognizing that it had failed to comply with NEPA,

the Bureau suspended construction on the project and ordered the preparation of a draft Environmental Assessment ("EA"). Id. at 235-36. Following the completion of the EA process, the Bureau once more authorized the project to proceed. Id. at 237. A citizen's group challenged the project, contending that the NEPA violations identified by the Bureau warranted injunctive relief. Id. The Bureau, in response, conceded that it had initially violated NEPA, but maintained that it had adequately "cured" those initial violations through the preparation of the supplemental EA. Id. at 248.

Taking square aim at the question whether "a defendant can cure an initial violation under NEPA," the district court began by noting that the statute's "ninety-plus year history . . . suggests that agencies, almost uniformly, do get a second chance" to correct NEPA errors. Id. at 249. Reviewing caselaw from several circuits, the court observed that agencies "are regularly permitted to prepare supplemental environmental documents" when new information comes to light in the course of a project. Id. (citing Natural Resources Defense Council v. Callaway, 524 F.2d 79, 94-95 (2nd Cir. 1975). The court also recognized that "agencies are routinely given a chance to comply with NEPA even after a court has held that they have violated the Act." Id. (citing Callaway, 524 F.2d at 95) (noting "serious deficiencies" in the Navy's initial NEPA documents with respect to a proposed dumping project, but permitting the agency an opportunity to remedy those deficiencies); Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 179 (3rd Cir. 2000) (holding that an agency may cure a procedural defect by suspending the offending project, curing the defect, and resubmitting the project); Richland Park Homeowners, 671 F.2d at 943 (holding that "[i]nitial noncompliance [under NEPA] does not preclude eventual compliance). Finally, the court opined that a second chance may be particularly warranted where the action taken by the agency to address the NEPA violation is "self-imposed, demonstrating a

10

recognition of error and a willingness to correct it." Id. at 252. Applying these principles, the court concluded that the Bureau had indeed cured the initial deficiencies by halting construction on the prison and undertaking "the kind of objective and good faith analysis that NEPA requires." Id. at 252.

As in Citizens Advisory Committee, the Forest Service has admitted its own NEPA violations, suspended the offending procedures, and is either attempting to correct them through the SEIS process, or has abandoned them. In the meantime, the Forest Service is managing oil and gas interests in the ANF in precisely the manner that the Plaintiffs would like them to: pursuant to the provisions of the 1986 Plan and the well-established framework of Minard Run. This is precisely what NEPA requires, and is the issue at the heart of Plaintiffs' claims in this action.[4] Citizens Advisory Committee, 197 F.Supp.2d at 249.

None of the cases cited by the Plaintiffs compel a different conclusion. In Callaway, for example, the Natural Resources Defense Council ("NRDC") challenged the process employed by the United States Navy to choose a dumping site for polluted material displaced during dredging operations. Callaway, 524 F.2d at 82. On appeal, the Second Circuit agreed that the final EIS adopted by the Navy was materially deficient and ordered the Navy to suspend operations and prepare a supplemental EIS addressing the deficiencies. Id. at 94-95; see also Dubois v. U.S. Dep't. of Agriculture, 102 F.3d 1273 (1st Cir. 1996) (ordering preparation of an SEIS to address new information that was included in a Final EIS despite not appearing in the Draft EIS); Environmental Defense Fund v. Marsh, 651 F.2d 983 (5th Cir. 1981) (halting a navigational

---

[4] At the most recent status conference before Chief Judge McLaughlin, Plaintiffs' counsel acknowledged that, although Plaintiffs are generally challenging the 2007 Plan as a whole, the issue driving this litigation is, and has been, the Plaintiffs' goal of undoing any improper changes to the 1986 Plan oil and gas procedures. ECF No. 56 at 7-8. Given that the Forest Service has been abiding by the 1986 Plan oil and gas procedures since 2008, and seemingly will continue to do so, the relief that lies at the center of Plaintiffs' claims is exactly what has already been provided at the direction of the Forest Service Chief.

project and ordering an SEIS because the agency had failed to consider major changes to the project). This remedy is entirely consistent with the self-imposed corrective measures ordered by the Forest Service Chief in the instant case. See AR at 4803 (ordering that "the use of the Revised Plan design criteria to private OGD is suspended" and directing the ANF Supervisor to "follow the site-specific authority as provided in the 1986 ANF Plan to administer private OGD" during the completion of an SEIS).

The Court reaches the same result with respect to Plaintiffs' APA and NFMA claims. The substance of Plaintiffs' APA claim is that the Forest Service violated the rulemaking requirements of Section 553 of the APA by adopting mandatory oil and gas standards without complying with the Act's notice and comment procedures. See 5 U.S.C. § 553 (setting out the procedures that an agency must follow in promulgating rules, including notice in the Federal Register and provision of a period of time for public comment). The substance of their NFMA claim is that the Forest Service lacks the authority to impose those standards at all. See Bowen v. Georgetown University Hosp., 488 U.S. 2014, 215-16 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). The remedy sought by the Plaintiffs in each instance is the same: to have the offending standards stricken from the 2007 Plan. This is exactly what the Forest Service Chief has already done.

In light of the foregoing, the Court concludes that no justiciable case or controversy remains. On the one hand, two subsequent developments have rendered the allegations in this action moot. First, the relief already provided by the Forest Service Chief's decision to overturn the offending provisions and order compliance with the APA is precisely the type of "[c]orrective action by an agency . . . that can moot a previously justiciable issue."

Commissioner v. Shapiro, 424 U.S. 612, 622-23 n. 7 (1976); Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n, 680 F.2d 810, 813-15 (D.C. Cir. 1982) ("NRDC") (holding that a procedural challenge to an agency's adoption of a rule was mooted by the agency's attempt to repromulgate the rule in accordance with the proper procedures). In NRDC, for example, the plaintiffs continued to press a challenge to an agency rule that had been created in violation of the APA's procedural requirements despite the agency's voluntary decision to rescind the rule and provide proper notice and opportunity for comment. Id. at 814. The Court deemed the challenge moot, noting that it "can hardly order the [agency] to do something that it has already done." Id.

Second, counsel for the Forest Service has indicated on the record that "the Forest Service has no plans to do anything related to updating the [oil and gas provisions] from the 1986 Plan." ECF No. 56 at 4. Although voluntary cessation of allegedly illegal conduct does not typically render a case moot, County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979), "voluntary cessation . . . *can* moot an issue when there is no reasonable expectation that the violation will recur, and interim relief or intervening events have completely eradicated the effects of the alleged violation." NRDC, 680 F.2d at 814 n. 8 (citing Davis, 440 U.S. at 631) (emphasis added); see also New Jersey Turnpike Authority v. Jersey Central Power and Light, 772 F.2d 25, 31 (3rd Cir. 1985) ("[T]he cessation of the conduct complained of makes the case moot if subsequent events make it clear that the wrongful behavior could not reasonably be expected to recur"). In light of the intervening decisions in Minard Run III and Minard Run V and the aforementioned representations from counsel, the Court concludes that there is no reasonable expectation that the Plaintiffs will be subjected to the same actions by the Forest Service at any point in the foreseeable future.

On the other hand, should the Forest Service unexpectedly revive its attempt to revise the oil and gas procedures in the 2007 Plan or otherwise move away from adherence to the relevant oil and gas procedures of the 1986 Plan, that decision can be challenged by the Plaintiffs once the process is complete and the claim has fully ripened.[5] See, e.g., Sierra Club v. U.S. Army Corps of Engineers, 481 F.Supp. 397, 399 (S.D.N.Y. 1979) (holding that a claim challenging the adequacy of an EIS does not ripen until the agency has made its final determination); Buckingham Township v. U.S., 1998 WL 19479, *8 (E.D. Pa. Jan. 16, 1998) (holding that a challenge to an ongoing EIS process is not yet ripe). The Court will therefore order that this action be dismissed without prejudice for want of a live justiciable case or controversy. That form of dismissal will preserve the ability of the Plaintiffs to petition to reopen this case and pick up where they left off, should the Forest Service resume the challenged activity by discontinuance of its adherence to the 1986 Plan.

## IV. CONCLUSION

For the reasons set forth herein, this action is dismissed without prejudice, for lack of jurisdiction based on the absence of a justiciable case or controversy. An appropriate Order will enter.

Dated: 2-21-14

cc: All Counsel of Record

Mark R. Hornak
United States District Judge

---

[5] For example, Plaintiffs contend that an agency may not merely "paper over" NEPA violations by issuing a supplemental EIS designed only to "rubber stamp" a decision that has already been made. Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000). While this principle is undoubtedly correct, Plaintiff's argument necessarily presupposes that the SEIS ordered by the Forest Service will merely "rubber stamp" the offending design criteria. That simply cannot be determined until a final decision issues.

14